# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MOTORS LIQUIDATION | ) | |
| COMPANY DIP LENDERS | ) | |
| TRUST, | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No: N11C-12-022 PRW (CCLD) |
| v. | ) | |
| | ) | |
| ALLIANZ INSURANCE | ) | |
| COMPANY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: December 11, 2015
Decided: March 2, 2016

**Upon Plaintiff's Motion for Reargument – *DENIED***

**ORDER**

1.      On December 4, 2015, Plaintiff timely filed reargument of the November 25, 2015 Memorandum Opinion and Order, granting summary judgment to Defendants noted below[1] and denying Plaintiff's cross-motion.[2]

2.      Plaintiff's reargument dwells on the court's failure to directly address three cases: *Hughes Aircraft,*[3] which Plaintiff raised in a footnote during

---

[1] All State Insurance Company, American International Underwriters, Granite State Insurance Company, Insurance Company of the State of Pennsylvania, Landmark Insurance Company, Lexington Insurance Company, Mt. McKinley Insurance Company, Munich Reinsurance America, Inc., National Union Fire Insurance Company of Pittsburgh, PA, and Travelers Casualty & Surety Company.

[2] *Motors Liquidation Co. DIP Lenders Trust v. Allianz Ins. Co.*, 2015 WL 10376123 (Del. Super. Nov. 25, 2015).

[3] *Smith v. Hughes Aircraft Co.*, 783 F. Supp. 1222, 1229 (D. Ariz. 1991), *aff'd in part, rev'd in part*, 22 F.3d 1432 (9th Cir. 1993).

summary judgment briefing; *SR International Business Ins. Co., Ltd.*,[4] which Plaintiff raised at oral argument; and *Mine Safety Appliance Co.*,[5] which was issued after argument.

3. Plaintiff also challenges a couple of background facts mentioned in passing, basically concerning the primary policies' claims history and prior litigation between old-GM, Plaintiff's predecessor, and Royal, old-GM's primary carrier.

4. Otherwise, Plaintiff's reargument mostly recapitulates Plaintiff's original arguments, which were decided. For example, as discussed below, Plaintiff insists again that the excess policies can be triggered without the primary policies having been triggered first, and if that is not the case, the 1977 Royal primary policy was triggered. Similarly, Plaintiff argues the court:

> disregarded the express follow form language in these Defendants' policies[, which states] that underlying provisions are not incorporated [into the excess policies] if the excess policies themselves contain their own provisions on a particular issue, as these policies do with their own trigger provisions.

As to that, of course the court considered the follow-form language. The lead paragraph in the Opinion said the question presented was whether the triggers were

---

[4] *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107 (2d Cir. 2006).
[5] *Mine Safety Appliances Co. v. AIU Ins. Co.*, 2015 WL 5829461 (Del. Super. Oct. 1, 2015).

inconsistent. The court concluded that Plaintiff's argument was circular, holding that when the primary and excess polices were read together, their trigger clauses could not only be harmonized, but accepting Plaintiff's assumptions would render other clauses in the excess policies meaningless, e.g. their net loss provisions.

5.     As to Plaintiff's three cases, the court regrets not having mentioned them by name, but it was not oversight. The cases were easily distinguishable and unhelpful. Because they were forgettable, they were forgotten. Defendants, especially AIG,[6] Travelers,[7] and London Market Companies,[8] explain nicely in their original briefs and responses here how *Hughes Aircraft*, *Mine Safety Appliance Co.,* and *SR International Business Ins. Co., Ltd.* are inapposite and do not

---

[6] D.I. #900 ("[*Hughes Aircraft*] deals with the specific issue, not present here, of whether an excess policy containing narrower exclusion language can apply even though lower level policies containing broader exclusion language may not apply. . . . [T]he issue [in *SR International*] was whether the 9/11 attacks on the World Trade Center constituted one or two occurrences for purposes of determining the limits of liability under various property policies. . . . [T]he issue in *Mine Safety* was whether an excess policy explicitly attaching above an underlying policy that had expired when the claim at issue arose nevertheless follows form to the expired underlying policy.").

[7] D.I. #902 ("[*Hughes Aircraft and SR International*] involve different policy language, different coverage issues (neither involves trigger, notwithstanding the Trust's statement to the contrary), and although it hardly matters, the law of different jurisdictions. . . . *Mine Safety* . . . supports . . . grant of Traveler[']s motion for summary judgment, as the case holds that the very 'Excess Net Loss' language . . . is unambiguous. . . . [and] [t]he case has nothing to do with whether an excess policy can be triggered if the primary insurance beneath it is not.").

[8] D.I. #901 ("*SR International*, decided under New York law, did not involve a situation in which the underlying policy was not triggered. Instead, the issue was how many times each policy was triggered. *Mine Safety Appliances* involved an allocation issue under Pennsylvania's 'all sums' regime, a regime the Court has now effectively held will not be applied to these policies . . . . The *Mine Safety* Court . . . constru[ed] an excess policy that overlapped two underlying policies with different limits. . . . There was no issue that the underlying policy was not triggered. Finally, *Hughes Aircraft* . . . did not have anything to do with trigger.").

3

support Plaintiff.[9]

6.      Similarly as to the reargued facts, Defendants accurately present the record developed through discovery after the court originally denied dismissal. To be clear, Defendants present the record in the light most favorable to Plaintiff.

7.      The court will not recapitulate, yet again, how it is unassailable that old-GM never saw the insurance it negotiated, purchased, and handled for decades as Plaintiff, in hindsight, sees it now. Nor will the court recapitulate how old-GM told this court and its Michigan counterpart that its primary coverage was "claims-made," not occurrence-based as Plaintiff nevertheless contends.

8.      Collectively, Defendants' opposition to reargument is legally and factually on-point, accurately reflecting the court's holding and its reasoning.[10] Two points, however, bear re-emphasis.

8.A.   First, Plaintiff grossly overstates and seriously mischaracterizes the Opinion's holding when Plaintiff pejoratively and repeatedly insists the holding

---

[9] *See supra* notes 6-8 and accompanying text.

[10] *See, e.g.,* London Market Companies' Resp. (D.I. #901) ("[T]he Court squarely found the Royal policies were 'claims-made' policies because of Endorsement 15."); Travelers's Resp. (D.I. #902) ("Independent from the rule that excess policies are typically not triggered by a claim that does not trigger the underlying primary policy, here the Court found that Travelers Policies specifically limit their coverage to loss covered by the underlying insurance: 'By their terms [the Travelers Policies] only pay claims 'covered' by the primary policy.' Although the excess policies have 'occurrence-based' language, the policies also have *clear language limiting their triggers to the underlying policy's trigger*.'").

turned on an "abstract notion."  Specifically, Plaintiff declares the decision was "based on 'an abstract notion that excess insurance must necessarily be no broader than the underlying.'"  Plaintiff trumpets "abstract notion" six times in reargument, always putting the term in quotes, inaccurately implying the court used the term.  Even if the court had used the quoted term, disparaging a legal holding simply because it has abstract qualities until informed by a specific cases's facts is not a logical argument.  That is so, even if the fallacious argument is repeated over-and-over.

8.B.    More importantly, the court never used the term "abstract notion," much less was the decision based on one.  The term was only used by a defendant's lawyer in oral argument.   And at that, counsel stated that Defendant was *not* basing its case on an "abstract notion that excess insurance must necessarily be no broader than the underlying."[11]  Although Plaintiff acknowledges that Defendants "did not even rely" on this "abstract notion," Plaintiff leaps to the incorrect conclusion that the court based its decision on it.

8.C.    Most importantly, everyone, the court included, agrees that an excess policy may be broader than the underlying.  The Opinion expressly recognizes

_____

[11] *Motors Liquidation Co. DIP Lenders Trust v. Allianz Ins. Co.*, N11C-12-022 FSS CCLD, at 28 (Del. Super. July 10, 2015) (TRANSCRIPT) ("We are not grounding our case on an abstract notion that excess insurance must necessarily be no broader than the underlying . . . .").

that.[12] Again, an insurance contract, if it does it clearly, may override a term-of-art's usual meaning. That, however, does not mean a common term-of-art, such as "excess insurance," has no generally accepted meaning on which parties to an insurance policy may rely in the absence of qualifying language. Indeed, Plaintiff's core argument counts on the court's applying the commonly recognized meaning of the term-of-art: "occurrence."

8.D. As the Opinion explains, the policies here were sold, denominated, and handled for decades as "excess insurance." In one way or another, every excess policy repeatedly refers to the primary or underlying insurance, or the like. The fact that the primary and excess policies have potentially inconsistent triggers, in effect, originally precluded dismissal, but now the court has seen a jury's fact-finding is unnecessary to harmonize the primary and excess policies. And, if fact-finding were necessary, old-GM's repeated characterization of its insurance as "claims-made," which was consistent with its long-term claims handling, also obviates a jury's help.

8.E. In truth as to "abstract notion," Plaintiff is the one relying on an abstract notion that despite the way a policy was marketed, denominated, framed, and

---

[12] *Motors Liquidation Co. DIP Lenders Trust*, 2015 WL 10376123 at 17–18 ("The court further appreciates that in the insurance context, 'primary' and 'excess' are words that may be defined differently from policy-to-policy. Thus, it is theoretically possible that a primary policy could be written to provide a self-retention . . . or an 'excess' policy could be written to provide both primary and excess coverage.").

handled by the world's then-largest corporation, the policy nonetheless provided coverage, as a matter of law, in an unforeseen way, contrary to the parties' expressed, written intent.

9.A. Second, as to the facts, it bears emphasis that the court saw that asbestos-related claims, albeit not the ones at issue here, were made against or reported to old-GM while the excess policies were on-risk. Thus, as the Opinion explains, were it not for Endorsement 15's game-changing effect from 1971 on, old-GM might have tendered those claims and Royal arguably would have aggregated those claims. Furthermore, and pivotal for Plaintiff, the longtail claims at issue might then have related-back to the first, in which event the excess policies' attachment points might have been reached, and the excess triggers might have come into play. Under that view, Plaintiff might have had a case. The court saw that.

9.B. What the court also saw, and Plaintiff glosses over, is that any claim made during a year when a Royal policy was on risk, was, in effect, handled that year, consistent with Endorsement 15's having unambiguously converted the primary coverage from occurrence-based to claims-made coverage, as old-GM and Royal intended. The salient and undisputed fact is that no claim *at issue* was made against or reported to old-GM, much less Royal, while a Royal policy was on-risk as to that claim. Hence, Defendants' point based on undisputed fact: The claims at

issue, all of which were made or reported years later, were not "covered by the terms of the controlling underlying insurance."[13]   And, it cannot be said by anyone–Plaintiff, the court, or a jury–that the underlying insurance, in theory or fact, covered any claim at issue.  Every claim here is out-of-time.  That, of course, leads to the holding as a matter of law, based on reading the excess and underlying policies together even taking into account the policies' trigger clauses, Defendants' excess policies do not cover the longtail claims at issue.

10.    In farewell, Defendants are cautioned, yet again, not to make the mistake of thumping their chests about the robust factual record in their favor.[14] It is beside the point that the record supports Defendants as it does.  As a matter of law, if a claim was made or reported after a primary policy was no longer on-risk, that claim is damned by Endorsement 15, so the claim does not trigger the primary policy. That is true, even if other claims were timely.  The late-filed claims, like the ones at issue here, cannot trigger the primary policies.  The court continues to hold, as a

---

[13]  Excess Overlayer Indemnity Policy Revised Definitions Excess Net Loss:
"Excess Net Loss" means that part of the total of all sums which the insured becomes legally obligated to pay or has paid, as damages on account of any one accident or occurrence, and which would be covered by the terms of the controlling underlying insurance, if written without any limit of liability, less realized recoveries and salvages, which is in excess of any self-insured retention and the total of the applicable limits of liability (except aggregate limits of liability) of all policies described in Section 3. Schedule of Underlying Insurance; whether or not such policies are in force or any aggregate limits of liability have been exceeded.
[14] *See e.g. Conagra v. Lexington Ins.*, 21 A.3d 62 (Del. 2011).

matter of law, that the late-filed claims are not covered by the underlying insurance. Therefore, the excess policies also do not cover them. Thus, as to the trigger clauses, trial is unnecessary.

For the foregoing reasons, Plaintiff's Motion for Reargument is **DENIED**.

**IT IS SO ORDERED.**

/s/ Fred S. Silverman
Judge (Retired)[15]

cc: Prothonotary
    Counsel of Record

---

[15] Designated under Del. Const. art. IV, § 38 and 29 *Del. C.* § 5610.